# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| KENNON DUNN,<br><br>        *Plaintiff,*<br><br>  **v.**<br><br>CITY OF FORT VALLEY; LT. LONNIE POSTELL; LT. WILLIE MARSHALL, JR.; OFFICER DONOVAN SCOTT-SINCLAIR; CPT. JEFFERY LUNDY; CHIEF LAWRENCE SPURGEON; KARIN VINSON; and MAYOR BARBARA WILLIAMS,[1]<br><br>        *Defendants.* | CIVIL ACTION NO.<br>**5:19-cv-00287-TES** |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

**The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.[2]**

Pretty simple rule.

---

[1] The parties previously dismissed Defendants Karin Vinson and Mayor Barbara Williams by stipulation. [Doc. 14].

[2] *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (collecting cases).

Yet, in July of 2018, deputies with the Fort Valley Police Department arrested Kennon Dunn, a self-described citizen-journalist, because he took pictures and recorded video in public areas of Fort Valley City Hall. And if that wasn't enough, the Fort Valley Police Department then issued Mr. Dunn two criminal trespass notifications, indefinitely barring him from entering Fort Valley City Hall or the Fort Valley Police Department without a police escort—even for the purpose of attending City Council meetings or conducting business. And, finally, the Fort Valley Police Department has refused to provide Dunn with any of the documents dealing with his case, notwithstanding that Dunn requested the records via the Open Records Act.

The Defendants contend that they had the right to arrest Mr. Dunn all along and that they were perfectly right to issue the trespass bans, basically arguing that he brought this trouble on himself. In fact, the Defendants believe that Mr. Dunn's "repeated refusal to cooperate with authorities belies[3] an intent to goad City officials into his arrest." [Doc. 7-1 at p. 2]. In the Defendants' bluntest of words: "Plaintiff's [C]omplaint smacks of a setup." [*Id.* at p. 1].

The individual Defendants attempt to escape liability by wrapping themselves in the virtually impenetrable cloak of qualified immunity. But, as the Court explains

---

[3] Given that "belies" means "to give a false impression," the Court isn't sure that the Defendants meant to use that word here. "Belies." *Merriam-Webster.com*. https://www.merriam-webster.com/dictionary/belie (May 18, 2020). Although the Court accurately quoted Defendants' brief, it nonetheless understands Defendants' point.

below, qualified immunity will not save them in this case. Not on the facts in this

Complaint. The Court has read and considered the parties' arguments, along with the

amicus brief submitted in the case, and, for the reasons more fully discussed below, the

Court **DENIES** Defendants' Motion to Dismiss [Doc. 7], and Mr. Dunn may proceed on

all counts.

## I.   <u>FACTUAL SUMMARY</u>[4]

Mr. Dunn categorizes himself as an independent journalist who composes news

broadcast videos that are then distributed online to his more than 8,000 followers via his

YouTube channel. [Doc. 1 at ¶¶ 14–15]. Mr. Dunn describes his broadcasts as "focusing

on issues of government accountability" and "educating the public on civic engagement

and constitutional rights." [*Id.*]. On July 9, 2018, Mr. Dunn intended to produce a

segment for his broadcast regarding missing persons in the Fort Valley, Georgia, area.

[*Id.* at ¶ 16].

> Mr. Dunn began his report by taking footage of the gazebo and other
> monuments on downtown Main Street. He then proceeded to the Fort
> Valley Police Department. Mr. Dunn took photos and video inside the
> historic Police Department building and around the grounds. The purpose
> of this footage was primarily to serve as "B-roll" for his report, but also to
> evaluate the building's accessibility for [people with disabilities], as Mr.
> Dunn is, himself, disabled. Several officers noticed Mr. Dunn filming there
> but did not speak to him. Mr. Dunn then proceeded next door to Fort Valley
> City Hall. He again took photographs and video of the inside of the
> building, including the Missing Persons posters on the public service

---

[4] When ruling on a Rule 12(b)(6) motion, district courts must accept the facts set forth in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). Thus, at this juncture, the Court relies on Mr. Dunn's version of the events and, when possible, quotes directly from his Complaint.

announcement board. Mr. Dunn, impressed to see a city official hard at work, shot additional footage from a distance of the mayor inside of her office. . . . At all times, Mr. Dunn was only present in the publicly accessible areas of City Hall.

[*Id.* at pp. at ¶¶ 16–19, 21]. His complaint clearly states that he neither carried a bag nor wore loose clothing while he took photos with his digital camera and recorded video using his handheld video camera and a bodycam. [*Id.* at ¶¶ 19, 22–23].

While Mr. Dunn was filming in City Hall, he drew the attention of a City Hall employee, Karin Vinson, who asked Mr. Dunn why he was recording. [*Id.* at ¶ 20]. "Mr. Dunn politely declined to inform her of his personal and professional reasons" for recording, but Ms. Vinson did not ask him to leave. [*Id.* at ¶¶ 20, 24]. He continued to remain in the public areas of City Hall and record footage. [*Id.* at ¶ 25]. "Vinson and Mayor Williams [then] called" the Fort Valley Police Department to report Mr. Dunn as a "suspicious person." [*Id.* at ¶ 24].

The Complaint then alleges that Lieutenant Lonnie Postell responded to the call and "aggressively questioned Mr. Dunn about his 'agenda' and immediately ordered him to step outside." [*Id.* at ¶ 25]. Mr. Dunn attempted to confirm his right to remain in the publicly accessible portion of City Hall and film. [*Id.* at ¶ 26]. Lt. Postell "acknowledged that the City Hall lobby was a publicly accessible area, but stated that the public was not allowed to take photographs there." [*Id.*]. According to Mr. Dunn, however, "[t]here was no signage or other indication of a policy prohibiting the public from taking photographs, and in fact there is no policy regarding photographing in

4

public areas of government buildings in Fort Valley, Georgia." [*Id.* at ¶ 27]. Lt. Postell

pulled Mr. Dunn's left arm behind his back and began to push Mr. Dunn toward the

door, so Mr. Dunn requested that Lt. Postell instead allow him to walk outside on his

own, using his cane.[5] [*Id.* at ¶ 28]. Lt. Postell permitted Mr. Dunn to exit the building

using his cane. [*Id.*].

Once outside City Hall, Officer Donovan Scott-Sinclair and Sergeant Derrick

Dunson joined Mr. Dunn and Lt. Postell. [*Id.* at ¶ 29]. Lt. Postell asked Mr. Dunn to

show identification, and Mr. Dunn replied that it was not on his person because he had

left it in his car. [*Id.* at ¶ 30]. Lt. Postell repeatedly asked for Mr. Dunn's name, which

Mr. Dunn offered to provide if Lt. Postell would disclose the crime for which Mr. Dunn

was being detained. [*Id.* at ¶ 32]. Lt. Postell informed Mr. Dunn that he was not allowed

to take pictures in City Hall without permission, and that it was a violation of Georgia

law to fail to carry identification at all times. [*Id.* at ¶¶ 31, 33].

Lt. Postell then consulted with Ms. Vinson, who informed him "that Mr. Dunn

was not allowed to take pictures of the mayor without permission." [*Id.* at ¶ 35]. Lt.

Postell then handcuffed Mr. Dunn; searched him; and confiscated his video camera

without his consent. [*Id.* at ¶ 37]. Mr. Dunn was then made to walk to the Police

Department, while handcuffed, which required him to use his cane at an abnormal

angle. [*Id.* at ¶ 38]. Mr. Dunn was not allowed to take a break during the walk, despite

---

[5] Mr. Dunn has a back injury and requires the assistance of a cane when walking. [Doc. 1 at ¶ 28].

telling the officers he was in pain. [*Id.*]. Officer Scott-Sinclair told Mr. Dunn "that he did

not care that he was in pain" and "that it was clear that Mr. Dunn had 'bad intentions,'

without explaining the basis for that claim." [*Id.* at ¶¶ 38–39].

At the Police Department, Mr. Dunn asked to speak with a supervisor. [*Id.* at ¶

40]. He was taken to a booking room where Lt. Postell continued to "interrogate" him,

despite Mr. Dunn's request for an attorney, and threatened to detain Mr. Dunn

indefinitely if he did not provide his name. [*Id.* at ¶¶ 40–41]. "Lt. Postell again informed

Mr. Dunn that his supposed 'crime' of taking photographs in City Hall was the reason

he demanded identification from Mr. Dunn." [*Id.* at ¶ 42]. Officer Scott-Sinclair turned

off Mr. Dunn's bodycam without his consent. [*Id.* at ¶ 43].

Captain Jeffery Lundy and Lieutenant Willie Marshall, Jr., also entered the booking

room. [*Id.* at ¶ 44]. "Mr. Dunn explained that he was engaging in activity protected by

the First Amendment and repeatedly asked the supervisors to contact their local District

Attorney to confirm that his actions were lawful." [*Id.*]. They informed him that he

could dispute the charges later, but they were charging him with "Obstruction." [*Id.* at

¶ 45]. Mr. Dunn broadcasted some of these interactions live on social media, and, upon

realizing this, Lt. Marshall placed Mr. Dunn in a holding cell and contacted Chief

Lawrence Spurgeon, who conferred with the local District Attorney. [*Id.* at ¶¶ 48–50].

Mr. Dunn then received a citation for a violation of Fort Valley City Ordinance 62-11,

Disorderly Conduct, despite no mention of disorderly conduct being made before the

call to the District Attorney. [*Id.* at ¶¶ 50–51]. The Fort Valley Police Department released Mr. Dunn from jail when he presented his identification in lieu of bail. [*Id.* at ¶ 74].

Mr. Dunn also received two criminal trespass notifications, indefinitely preventing him from entering City Hall or the Fort Valley Police Department, which the Complaint alleges meant that Mr. Dunn must call for a police escort if he wished to conduct business in these buildings and that he is not allowed inside for any other reason, including filming or attending public meetings. [*Id.* at ¶¶ 56–57]. Lt. Marshall told Mr. Dunn that he would be allowed into the municipal court for the case regarding his citation, but only in the company of his attorney. [*Id.* at ¶ 58]. Lt. Marshall stated that the bans were in effect "until the City or City Council decides to lift them."[6] [*Id.* at ¶ 59]. Mr. Dunn was not given any information on how to challenge the bans, and they remain in place. [*Id.* at ¶ 61].

Because the City of Fort Valley issued the trespass notifications, Mr. Dunn asserts that the bans "represent the official policy of the City of Fort Valley," which "allows for the banning of persons from public areas without adequate standards for enforcement and without time limits or an appeal process." [*Id.* at ¶¶ 63–65]. Mr. Dunn claims that

---

[6] Mayor Williams subsequently informed Mr. Dunn via telephone that she did not have the authority to lift the bans and that it was the responsibility of the police department to do so. [*Id.* at ¶ 60]

"Lt. Marshall had the final and unreviewable authority to issue the ban." [*Id.* at ¶ 67].

Specifically, Mr. Dunn's Complaint alleges that

> [t]here is no exception in the documents that would allow Mr. Dunn to attend meetings of the Fort Valley City Council, film activity in City Hall or the Police Department, or access the Fort Valley Municipal Court. The documents do not specify the method for challenging the bans or the procedure for accessing government property to conduct legitimate business while the bans are in place. Mr. Dunn wishes to further broadcast reports of activities in Fort Valley City Hall and Police Department, including any newly posted Missing Persons announcements. Mr. Dunn has not attempted to enter Fort Valley City Hall or Police Department without a police escort since July 9, 2018[,] because he reasonably believes and fears he will be arrested and prosecuted for doing so.

[*Id.* at ¶¶ 70–73].

On November 13, 2018, the Peach County District Attorney dismissed the disorderly conduct charge against Mr. Dunn. [*Id.* at ¶ 75]. Two days later, Mr. Dunn attempted to have the bans lifted by providing a copy of the letter confirming dismissal of the charge against him. [*Id.* at ¶ 76]. Mr. Dunn, as required by the bans, "called from outside of the building to have an officer escort him inside to conduct his business [of delivering the letter]." [*Id.* at ¶ 77]. Mr. Dunn alleges that Lt. Marshall knew that he had requested the required escort, but he "refused to allow him on the property and instructed other officers not to allow him to come inside." [*Id.*]. Eventually, Mr. Dunn was able to submit his letter requesting that the bans be lifted, and, on December 14, 2018,

>Chief Spurgeon sent a letter responding to the complaint and ratifying the issuance of the criminal trespass notifications by indicating that the notifications were 'proactive measures' that were 'both necessary and prudent.' Chief Spurgeon did not explain his reason for refusing to lift the ban. He did not give Mr. Dunn any information as to how he might appeal the decision. The Chief also threatened to continue to prosecute the Disorderly Conduct charge in City Court, despite the county District Attorney's dismissal.

[*Id*. at ¶¶ 78–81] (alteration adopted). Furthermore, Mr. Dunn alleges that, on multiple occasions, he has had to stand outside for long periods of time waiting for a police escort in order to conduct business in Fort Valley Police Department and City Hall. [*Id*. at ¶ 83].

In addition, Mr. Dunn has made repeated requests to the Fort Valley Police Department for information pertaining to his case pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq*. [*Id*. at ¶ 84]. However, as of the date of his Complaint, Mr. Dunn had not received a response beyond acknowledgement of receipt of his requests and an assertion that the requested documents could be withheld under Georgia law.[7] [*Id*. at ¶ 87].

---

[7] Georgia's Open Records Act exempts:

>Records of law enforcement, prosecution, or regulatory agencies in any pending investigation or prosecution of criminal or unlawful activity, other than initial police arrest reports and initial incident reports; *provided, however, that an investigation or prosecution shall no longer be deemed to be pending when all direct litigation involving such investigation and prosecution has become final or otherwise terminated*[.]

O.C.G.A. § 50-18-72(a)(4) (emphasis added).

## II.   STANDARD OF REVIEW

When ruling on a Rule 12(b)(6) motion, district courts must accept the facts set forth in the complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). A complaint survives a motion to dismiss if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). In fact, a well-pled complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted). To decide whether a complaint survives a motion to dismiss, district courts use a two-step framework. *Id.* The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal,* 556 U.S. at 679).

Furthermore, a complaint attacked by a 12(b)(6) motion is subject to dismissal when it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "A plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (internal quotations omitted); *see also Twombly*, 550 U.S. at 555. "To be sure, a plaintiff may use legal conclusions to structure his complaint, but legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in the complaint as true; they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 545, 555. Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual

11

enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

### III.   PLAINTIFF'S CONSTITUTIONAL CLAIMS UNDER 42 U.S.C. § 1983

> In order to prevail in a civil rights action under [§] 1983, "a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law."

*Tisdale v. Gravitt*, 51 F. Supp. 3d 1378, 1388 (N.D. Ga. 2014) (quoting *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

Supervisors can also be held liable under § 1983 for an employee's actions; however, if the supervisor a plaintiff seeks to hold liable "was not present at the time that the alleged constitutional violation occurred, the standard to impose liability upon him is 'extremely rigorous.'" *Gainor v. Douglas Cty.*, 59 F. Supp. 2d 1259, 1290 (N.D. Ga. 1998) (citing *Braddy v. Fla. Dept. of Labor and Emp't Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). A supervisor's liability becomes an issue "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervisory official and the alleged constitutional deprivation."

*Gainor*, 59 F. Supp. 2d at 1290 (citing *Braddy*, 133 F.3d at 801); *see also Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007). However, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under [§] 1983." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (discussing an officer's failure to intervene during an unprovoked beating) (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)). Of course, though, a plaintiff must always show that the defendant is not protected by qualified immunity.

### Qualified Immunity

The doctrine of "[q]ualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Toole v. City of Atlanta*, 798 F. App'x 381, 384–85 (11th Cir. 2019) (quoting *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012)). It is a "generous" doctrine in that "it protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 385 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The defense of qualified immunity aims to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

13

The confines of a qualified immunity analysis are well-known. It "begins with the threshold question of whether [a public official] 'was acting within his discretionary authority' during the event in question." *Toole*, 798 F. App'x at 385 (quoting *Skop*, 485 F.3d at 1136). In the instant case, for the purposes of Defendants' Motion, the parties agree that the actions of the officers were discretionary. [Doc. 7-1 at p. 5 ("The decision to arrest a suspect is plainly discretionary.")]; [Doc. 13 at p. 2 n.2]. Thus, the Court need not address that issue, and the burden shifts to Mr. Dunn, as the plaintiff, to show that the official is not entitled to qualified immunity. *Skop*, 485 F.3d at 1136–37; *see also Elmore v. Fulton Cty. Sch. Dist.*, 605 F. App'x 906, 909–10 (11th Cir. 2015).

To do so, Mr. Dunn must show two things: (1) that Defendants' conduct violated a statutory or constitutional right and (2) that the violation was "clearly established to ensure that 'officers are on notice [that] their conduct is unlawful.'"[8] *Skop*, 485 F.3d at 1137; *Elmore*, 605 F. App'x at 910. Now, "[w]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] . . . assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982)). Lastly, "[a] federal right is 'clearly established' when 'the contours of the

---

[8] "[T]he judges of the district courts . . . [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Croland v. City of Atlanta*, 782 F. App'x 753, 756 (11th Cir. 2019) (quoting *al-Kidd*, 563 U.S. at 741) (alteration adopted).

Succinctly put, "qualified immunity will be denied only if the preexisting law by case law or otherwise makes it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018)). However, it must be noted that "a judicial precedent with identical facts is not essential for the law to be clearly established." *Id.* (citation omitted). Thus, while the doctrine "gives ample room for mistaken judgment," it stops short of "protect[ing] the plainly incompetent or those who knowingly violate the law." *Gonzalez v. Butts Cty.*, 522 F. App'x 742, 746 (11th Cir. 2013) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004)). With the foregoing in mind, the Court takes a careful examination of each of Mr. Dunn's counts.

### Count II (Unlawful Search and Seizure)[9]

"Under the Fourth Amendment,[10] an individual has a right to be free from

---

[9] "When an officer has arguable probable cause to arrest, he is entitled to qualified immunity *both* from Fourth Amendment claims for false arrest and from First Amendment claims stemming from the arrest." *Gates*, 884 F.3d at 1298 (emphasis added). Thus, the Court examines Mr. Dunn's Counts out of numerical order and first examines whether he states a plausible claim for violation of his Fourth Amendment rights.

[10] The Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, guarantees the right against unreasonable searches and seizures. *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). Thus, a cause of action for a violation of the Fourth Amendment may be asserted through § 1983 as a claim for damages. *Id.*

unreasonable searches and seizures," and an arrest of a person, in the context of the Fourth Amendment, constitutes a seizure. *Skop*, 485 F.3d at 1137 (citation omitted). "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Tisdale*, 51 F. Supp. 3d at 1396 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). Here, Mr. Dunn's Complaint clearly says that he was arrested, and Defendants don't contend otherwise. [Doc. 1 at ¶ 35]. So now, the Court must look to the "reasonableness" of his arrest, which is determined by the presence or absence of probable cause. *Skop*, 485 F.3d at 1137. This probable cause may come in the form of actual probable cause or arguable probable cause.

## Actual Probable Cause

First, let's examine actual probable cause. So far, we know that "[b]roadly speaking, a warrantless arrest made without probable cause violates the Constitution" and can create liability under § 1983. *Croland*, 782 F. App'x at 756 (citing *Gates*, 884 F.3d at 1297). Conversely, "the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010).

"Probable cause exists when the facts and circumstances, of which the official has reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense." *Elmore*, 605

F. App'x 906, 911 (11th Cir. 2015). As long as the circumstances known to the arresting official, when viewed objectively, can "give probable cause to arrest *for any crime*, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges." *Id.* at 914 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004)) (emphasis added). Thus, when a law enforcement official lacks the requisite facts and circumstances, yet still arrests an individual, the official does so without probable cause and violates the Fourth Amendment. However, this does not inevitably remove the shield of qualified immunity. *Skop*, 485 F.3d at 1137. This brings us to our second form of probable cause—arguable probable cause.

### Arguable Probable Cause

The law does not "automatically hold an [official] liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." *Id.* Because officials will, in some cases, "reasonably but mistakenly conclude that probable cause is present," the law does not hold those officials personally liable for their mistaken judgment. *Id.* (quoting *Anderson*, 483 U.S. at 641). By this principle, even if a court determines that an official did not, in fact, have probable cause, the standard of "arguable probable cause" may be applied—that is, whether "reasonable offic[ials] in the same circumstances and possessing the same knowledge as the [arresting official] *could have believed* that probable cause existed to arrest." *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)). Since the "arguable

probable cause" standard recognizes that the official may make reasonable but mistaken judgments, it is "all that is required for qualified immunity to be applicable." *Skop*, 485 F.3d at 1137 (citation omitted); *Brown*, 608 F.3d at 734 ("To receive qualified immunity" as to a Fourth Amendment unlawful seizure claim, "an officer need not have actual probable cause, but only 'arguable' probable cause."). However, it is not a standard that shields officials who unreasonably conclude that probable cause existed. *Id.*

> In determining whether an officer lacked arguable probable cause to justify an arrest—i.e., whether the right was clearly established at the time of the incident—under controlling law we turn to the precedent of the United States Supreme Court, the precedent of [the Eleventh Circuit Court of Appeals], and to the highest court of the relevant state in interpreting and applying the law in similar circumstances. [The Eleventh Circuit Court of Appeals] has said clearly, consistently, and on numerous occasions that we may only consider the precedent of these courts in determining whether the case law has "clearly established" a right for qualified immunity purposes.

*Poulakis v Rogers*, 341 F. App'x 523, 527–28 (collecting cases). By now, it is well established in the Eleventh Circuit that "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Id.* at 528 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)).

Notably, the "validity of an arrest does not turn on the offense announced by the offic[ial] at the time of the arrest." *Gonzalez v. Butts Cty.*, 522 F. App'x 742, 746 (11th Cir. 2013) (quoting *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1119 n.4 (11th

Cir. 1992)). If the arresting official had arguable probable cause to arrest for *any* offense,

qualified immunity will still protect the official. *Croland*, 782 F. App'x 753, 757 (11th Cir.

2019) (emphasis added).[11] However, "a constitutional arrest must be based on a

reasonable belief that a crime[12] has occurred, rather than simply unwanted conduct." *Id.*

(quoting *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013)). Therefore, "qualified

immunity will not protect an officer who makes an arrest under circumstances 'where it

is clear that the conduct in question does not rise to the level of a crime, under the facts

known at the time.'" *Id*. (quoting *Wilkerson*, 736 F.3d at 978–79).

Accordingly, to unravel whether Mr. Dunn's arrest was constitutional under the

Fourth Amendment, the Court needs to discuss whether actual probable cause or

arguable probable cause existed to arrest Mr. Dunn for violation of any offense under

local ordinance or Georgia statute.

## <u>Georgia's Loitering Statute</u>

Reading the facts in the light most favorable to Plaintiff, Lt. Postell clearly

arrested Mr. Dunn.[13] [Doc. 1 at ¶ 37]. Although the law enforcement officers in this case

---

[11] Indeed, the United States Supreme Court has held that "[i]f an offic[ial] has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Lee*, 284 F.3d at 1194–95 (11th Cir. 2002).

[12] The Eleventh Circuit Court of Appeals has stressed that "showing arguable probable cause does not require proving every element of a crime." *Croland*, 782 F. App'x at 757 (quoting *Wilkerson*, 736 F.3d at 978) (cleaned up).

[13] Exactly when he was arrested really doesn't matter for purposes of Defendants' Motion.

initially charged Mr. Dunn with violating Fort Valley's "disorderly conduct" city

ordinance, the real question is whether the facts known to them at the time of arrest

support a finding of either actual or arguable probable cause to arrest at all. [*Id.* at ¶¶

50–52]. In their dismissal motion, however, Defendants argue that they had actual (or at

least arguable) probable cause to arrest Mr. Dunn for the misdemeanor offense of

loitering, as codified at O.C.G.A. § 16-11-36. If they did, they win. If they did not,

qualified immunity doesn't apply.

In Georgia, "[a] person commits the offense of loitering or prowling when he is

in a place at a time or in a manner not usual for law-abiding individuals under

circumstances that warrant a justifiable and reasonable alarm or immediate concern for

the safety of persons or property in the vicinity." O.C.G.A. § 16-11-36(a).

> Among the circumstances which may be considered in determining
> whether alarm is warranted is the fact that the person takes flight upon the
> appearance of a law enforcement officer, refuses to identify himself, or
> manifestly endeavors to conceal himself or any object. Unless flight by the
> person or other circumstances make it impracticable, a law enforcement
> officer shall, prior to any arrest for an offense under this Code section,
> afford the person an opportunity to dispel any alarm or immediate concern
> which would otherwise be warranted by requesting the person to identify
> himself and explain his presence and conduct. No person shall be convicted
> of an offense under this Code section if the law enforcement officer failed
> to comply with the foregoing procedure or if it appears at trial that the
> explanation given by the person was true and would have dispelled the
> alarm or immediate concern.

§ 16-11-36 (b). In addition, the Supreme Court of Georgia has opined that "Section (b)

offers guidelines to assist the officer in making this determination. However, these

guidelines do not require the officer to make an arrest, even if one or more of the situations suggested therein is present." *Bell v. State*, 313 S.E.2d 678, 681 (Ga. 1984). And, " . . . the section requires at least some manifestation of aberrant behavior." *Id.* at 680. Furthermore, "the words 'under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity' mean those circumstances where peace and order are threatened or where the safety of persons or property is jeopardized." *Id.* at 681 (citing *State v. Ecker,* 311 So.2d 104, 108 (Fla. 1975)).[14]

The Court notes that while law enforcement officers "have the right to request citizens to answer voluntarily questions concerning unsolved crimes, they have no right to compel them to answer." *Id.* at 682 (quoting *Kolender v. Lawson*, 461 U.S. 352, 360 n.9 (1983)). "[Section] 16-11-36 . . . does not require a suspect to provide information, but, rather, guarantees him the opportunity to explain his conduct, thereby possibly dispelling the officer's concern for the safety of persons or property before any official action is allowed." *Bell*, 313 S.E.2d at 682. Having discussed the applicable law, the Court turns its attention to whether Defendants are entitled to qualified immunity for

---

[14] The Georgia Supreme Court relied upon Florida case law because "[Georgia's] legislature enacted O.C.G.A. § 16-11-36 (Code Ann. § 26-2616) in 1980, patterning it after the Florida loitering statute, § 856.021, and Section 250.6 of the Model Penal Code." *Bell v. State*, 313 S.E.2d 678, 680 (1984). With the exception of minor distinctions, O.C.G.A. § 16-11-36 is identical to the Florida statute and Model Penal Code.

Mr. Dunn's second count, a claim for unlawful search and seizure against all

Defendants in their individual capacities. [Doc. 1 at p. 22].

<u>**Discussion**</u>

In examining whether qualified immunity applies to Defendants as to Count II,

Mr. Dunn "does not contest" that the Defendants' actions were discretionary. [Doc. 13

at p. 2, n.2]. Therefore, the Court moves on to determine whether Mr. Dunn has alleged

sufficient facts in his Complaint to demonstrate that Defendants are not entitled to

qualified immunity by showing that (1) his constitutional right to be free from

unreasonable search and seizure was "clearly established" and that (2) Defendants'

conduct violated his constitutional right to be free from unreasonable search and

seizure. *See Skop,* 485 F.3d at 1137.

The Eleventh Circuit Court of Appeals recently reiterated that "binding

precedent clearly establishes that an arrest made without arguable probable cause

violates the Fourth Amendment's prohibition on unreasonable searches and seizures[.]"

*Toole,* 798 F. App'x at 387 (quoting *Skop,* 485 F.3d at 1143) (cleaned up). Defendants

correctly assert that a generalized acknowledgement of a right is not sufficient to put an

officer on notice that his or her conduct violates a constitutional right. However, the

Court bears in mind that the law "do[es] not require a case directly on point, but

existing precedent must have placed the statutory or constitutional question *beyond*

*debate*." *Croland,* 782 F. App'x at 756 (quoting *al-Kidd,* 563 U.S. at 741). Here, there can be

no debate—citizens have a clearly established right to be free from arrest without actual or arguable probable cause.

Having determined that Mr. Dunn's Fourth Amendment right was indeed clearly established, the Court moves on to examine whether the arresting officers had any level of probable cause to arrest Mr. Dunn for loitering. This analysis begins with an examination of the facts known to the officers at the time of the arrest, which the Court summarizes as follows.

Mr. Dunn was at all times in a public place during normal business hours; he was videoing and photographing activity in Fort Valley City Hall using a bodycam, digital camera, and handheld video camera; he did not carry a bag, nor was he wearing baggy clothing; he declined to identify himself to Ms. Vinson;[15] she reported him to Fort Valley Police as a "suspicious person," but no one requested he leave City Hall until Lt. Postell did so; he attempted to confirm with Lt. Postell that he was in a public place and to assert his First Amendment right to photograph and record a public place; he did not raise his voice, state any threats, or attempt to flee; and he did not resist seizure by Lt. Postell.

Set against this factual backdrop, Defendants argue that the act of filming in Fort Valley City Hall was "an unusual occurrence" and that Mr. Dunn's failure to explain his

---

[15] As for his response to Lt. Postell's request that he identify himself, Mr. Dunn stated that "he did not have identification on him" because he had "left it inside of his car." [Doc. 1 at ¶ 30].

activity created probable cause to justify Lt. Postell's decision to arrest Mr. Dunn for loitering—in City Hall. [Doc. 7-1 at pp. 7–8]. However, given that Mr. Dunn only recorded in public areas and there are no policies enacted (much less published) to establish any "time, place, and manner" restrictions, the Court is unpersuaded that Mr. Dunn's actions of videotaping and photographing public property and public officials at work is the type of behavior that should be classified as "not usual for law-abiding individuals." Critically, the text of the loitering statute makes it clear that a person loiters when he is in a place, in a manner, unusual for "law-abiding" citizens. Given that Mr. Dunn engaged in an activity that is constitutionally protected, how could he not be abiding by the law? *See City of Cumming, infra.* It should not be considered unusual for citizens to take pictures of public officials on public property.

Further, the loitering statute allows police intervention in those instances where "peace and order are threatened or where the safety of persons or property is jeopardized." O.C.G.A. § 16-11-36. Yet, Defendants' arguments don't explain how Mr. Dunn threatened peace and order nor do they explain why the officers reasonably perceived his actions to jeopardize the safety of persons or property. Instead, they rely on Mr. Dunn's "refusal to identify himself and answer simple questions regarding his conduct" and that he was present "with multiple pieces of recording equipment" as sufficient facts and circumstances to give them arguable probable cause under the loitering statute. [Doc. 7-1 at p. 2]. But, as *Bell* teaches us, such reasoning simply fails.

313 S.E.2d at 682. As explained above, a citizen appearing in a government office to record public officials (especially in a jurisdiction with no restrictions on recording at all) should not be considered acting in a manner unusual for law abiding citizens, and the facts as alleged in the Complaint don't provide any inference that Mr. Dunn jeopardized any person or property.

In fact, construing the facts in a light most favorably to Mr. Dunn, it appears that the Defendants were clearly annoyed that he did not immediately produce his identification. While Georgia law provides that before they could arrest Mr. Dunn for loitering, they had to give him the *opportunity* to explain himself, there is no legal requirement that Mr. Dunn had to actually provide the information they requested. *See id*. More importantly, Defendants fail to show that Mr. Dunn jeopardized the peace and safety or that anyone was reasonably alarmed (as opposed to merely annoyed) by his presence as is required by the loitering statute.

As to supervisors Cpt. Lundy, Lt. Marshall, and Chief Spurgeon, Mr. Dunn concedes that they were not present "at the exact moment of [his] arrest." [Doc. 13 at p. 22]. Mr. Dunn argues, however, that the conduct of these Defendants "in continuing to detain Mr. Dunn in the face of evidence that he committed no crime whatsoever . . . creates a sufficient causal connection to the unconstitutional arrest." [*Id*. (citing [Doc. 1 at ¶¶ 44–51])]. Mr. Dunn's Complaint alleges that these Defendants unequivocally intended to pursue charges against him. For example, Cpt. Lundy stated that he had to

charge Mr. Dunn with a crime "because he had already been arrested and brought to the booking room," and Lt. Marshall was the one who placed Mr. Dunn in a holding cell and contacted Chief Spurgeon, who after conferring with the District Attorney, instructed the officers to charge Mr. Dunn with disorderly conduct. [Doc. 1 at ¶¶ 46–47, 49–50, 56].

These facts, at the earliest of stages in the litigation, effectively state a claim against the supervisors because they potentially demonstrate that a "sufficient connection exists" between their conduct and Mr. Dunn's continued detention. [Doc. 13 at p. 22 (citing *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1218 (11th Cir. 1995))]. On this issue, the Eleventh Circuit Court of Appeals has held that "where an officer was present during an arrest and knew that the arresting officer had no reasonable basis for arguable probable cause, the non-arresting officer could be liable under § 1983 if he was sufficiently involved." *Wilkerson*, 736 F.3d at 974 (citing *Jones v. Cannon*, 174 F.3d 1271, 1283–84 (11th Cir. 1999)). "What is made explicit in *Jones* is that a participant in an arrest, even if not the arresting officer, may be liable if he knew the arrest lacked any constitutional basis and yet participated in some way." *Wilkerson*, 736 F.3d at 980.

Here, taking the Complaint as drafted, these supervisory defendants knew the relevant facts of the situation and should have known that there was no reasonable basis to arrest Mr. Dunn. That is not to say that some Defendants may not ultimately win on summary judgment, but Plaintiff has alleged enough to survive this Motion.

Bottom line: the Court simply cannot accept the Defendants' argument that *any* reasonable officer, knowing what Defendants knew at that time, would arrest Mr. Dunn for being a prowler—a prowler—in City Hall. Accepting the Complaint as true, the Court finds that the Defendants lacked probable cause to arrest Mr. Dunn.

Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count II, and Mr. Dunn's unlawful seizure claim shall move forward against each Defendant.[16]

### Count I (Deprivation of First Amendment Rights)

"The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *City of Cumming*, 212 F.3d at 1333. Individuals have, under the First Amendment, the right, "subject to reasonable time, manner[,] and place restrictions, to photograph or videotape police conduct." *Toole*, 798 F. App'x at 387 (quoting *City of Cumming*, 212 F.3d at 1333). Moreover, Eleventh Circuit precedent holds that law enforcement officers may not arrest an individual as a way "to thwart or intrude upon First Amendment rights otherwise being validly asserted." *Toole*, 798 F. App'x at 387

---

[16] The Court also notes, in the interest of ensuring a clear record, the Complaint lists "all Defendants in their individual capacities;" however, Plaintiff has clarified that neither Count I nor Count II are raised against the City of Fort Valley. *See* [Doc. 13 at p. 28 n.8].

(citing *Kelly v. Page*, 335 F.2d 114, 119 (5th Cir. 1964)).[17] Thus, a plaintiff plausibly states a First Amendment violation by alleging he was arrested for documenting the activity of public officials on public property. *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014) (holding that plaintiff had plausibly stated a First Amendment violation by claiming "that he was arrested for taking photographs of alleged police misconduct and police then deleted the photographs he took").

In evaluating Mr. Dunn's First Amendment claim, the Court must first examine whether the Defendants are entitled to qualified immunity. Again, Mr. Dunn concedes that Defendants' actions were discretionary. [Doc. 13 at p. 2 n.2]. Thus, the Court moves on to address whether Mr. Dunn's First Amendment right was clearly established and whether Defendants' conduct violated that right.

The caselaw cited above easily demonstrates that the right to record public officials on public property is a clearly established First Amendment right. The Complaint clearly alleges that Mr. Dunn exercised his First Amendment right in a peaceful manner, and accepting that as true, Defendants lacked the authority to stop him. *City of Cumming*, 212 F.3d at 1333; *see also* [Doc. 1 at ¶ 27 ("There was no signage or other indication of a policy prohibiting the public from taking photographs, and in fact

---

[17] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

there is no policy regarding photographing in public areas of government buildings in Fort Valley, Georgia[.]")]. Therefore, qualified immunity does not apply to this count either, and the Court **DENIES** Defendant's Motion to Dismiss Count I. Mr. Dunn's First Amendment claim shall move forward against each Defendant.

### Count IV (Malicious Prosecution)

The Eleventh Circuit Court of Appeals

> has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983. . . . [A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law.
>
> To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; *and* (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. . . . As to the first prong, the constituent elements of the common law tort of malicious prosecution are: '(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor;[18] and (4) caused damage to the plaintiff accused.' . . . As to the second prong, it is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. . . .

*Grider v. City of Auburn*, 618 F.3d 1240, 1256–57 (11th Cir. 2010) (internal citations omitted).

---

[18] *See, e.g.*, *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998) ("[C]ourts have found favorable termination to exist by virtue of an acquittal, an order of dismissal reflecting an affirmative decision not to prosecute, a dismissal based on the running of the statute of limitations, an entry of a nolle prosequi, and, in some cases, a granted writ of habeas corpus.").

Here, Mr. Dunn brings his malicious prosecution claim against Lt. Marshall, Cpt. Lundy, and Chief Spurgeon. The Court first looks to whether qualified immunity shields these officers; however, for the reasons already discussed in detail above, the Court finds that they are not entitled to qualified immunity for his arrest because Mr. Dunn was arrested without probable cause. Therefore, the Court examines whether Mr. Dunn's Complaint adequately demonstrates that he can satisfy the elements of the common law tort of malicious prosecution. *See, e.g., Grider, supra.*

According to Mr. Dunn, Lt. Marshall and Cpt. Lundy informed him that they intended to pursue charges against him. [Doc. 1 at ¶¶ 46–47, 49–50, 56]. To support this claim, Mr. Dunn contends that Cpt. Lundy stated that "[he] had to be charged with a crime . . . because he had already been arrested and brought to the booking room." [*Id.* at ¶ 47]. Further, Chief Spurgeon instructed his subordinates to charge Mr. Dunn with disorderly conduct, and, later, threatened to resume prosecution of the charge despite the District Attorney having already dropped it. [*Id.* at ¶¶ 50, 81].

As to the first prong from *Grider*, the allegations in Mr. Dunn's Complaint satisfy the element that these officers "instituted or continued" criminal prosecution and demonstrated malice in their choice to do so. 618 F.3d at 1256–57; *see also* [*id.* at ¶¶ 25–83]. In fact, Mr. Dunn was already arrested before Defendants Lt. Marshall, Cpt. Lundy, and Chief Spurgeon even decided the crime (or charge) that supposedly supported the arrest. This is sufficient to support the inference of malice at this point. Next, the charge

against Mr. Dunn terminated in his favor when the District Attorney declined to prosecute, and Mr. Dunn claims that he suffered damages in relation to this malicious prosecution in the form of physical and emotional distress and a deprivation of his constitutional rights. [*Id.* at ¶ 55, 81].

The Court finds that Mr. Dunn's Complaint adequately alleges that Defendants Lt. Marshall, Cpt. Lundy, and Chief Spurgeon arrested him without probable cause and that it otherwise, under a Rule 12(b)(6)-based motion, provides enough facts to satisfy the common law elements of malicious prosecution. Based on this, the Court **DENIES** Defendants Lt. Marshall, Cpt. Lundy, and Chief Spurgeon's Motion to Dismiss Count IV, and Mr. Dunn's malicious prosecution claim shall proceed against them.

### IV.    PLAINTIFF'S CLAIM UNDER THE PRIVACY PROTECTION ACT

Through the Privacy Protection Act, 42 U.S.C. §§ 2000aa *et seq.*, ("PPA"), Congress has established that

> it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or

seize any work product materials[19] [or documentary materials][20] possessed by a person *reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication*, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, *if--there is probable cause* to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate[ ] . . . or . . . there is *reason to believe that the immediate seizure of such materials is necessary to prevent the death of, or serious bodily injury to, a human being.*

42 U.S.C. § 2000aa(a) (emphasis added).

Furthermore, the PPA creates a specific cause of action, by providing that

[a] person aggrieved by a search for or seizure of materials in violation of [42 U.S.C. § 2000aa] shall have a civil cause of action for damages for such search or seizure . . . against any other governmental unit, . . . which shall be liable for violations of [42 U.S.C. § 2000aa] by [its] officers or employees while acting within the scope or under color of their office or employment[.]

42 U.S.C. § 2000aa-6(a). In this context, "'[a]ny other governmental unit'" . . . includes

'any local government,' or 'unit of local government.'" 42 U.S.C. § 2000aa-7(c).

---

[19] "Work product materials," as used in this chapter, means materials, other than contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, and (1) in anticipation of communicating such materials to the public, are prepared, produced, authored, or created, whether by the person in possession of the materials or by any other person; (2) are possessed for the purposes of communicating such materials to the public; and (3) include mental impressions, conclusions, opinions, or theories of the person who prepared, produced, authored, or created such material. 42 U.S.C. § 2000aa-7(b).

[20] "Documentary materials", as used in this chapter, means materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense. 42 U.S.C. § 2000aa-7(a).

To support dismissal of this claim against them, Defendants argue that the PPA applies only to searches and seizures based on a warrant, relying upon the reasoning of *Sennett v. United States*, 778 F. Supp. 2d 655, 662 (E.D. Va. 2011), *aff'd* 667 F.3d 531 (4th Cir. 2012). [Doc. 7-1 at pp. 14–15]. However, while *Sennett* references a congressional report that mentions restrictions on warrants, the case itself does not focus on the specific issue of acquiring warrants, but rather notes that the PPA is intended to ensure that covered materials are not gained through unopposable search and seizure but rather via processes that allow for filing of objections. 778 F. Supp. 2d at 662 ("It is important to note, however, that the PPA's prohibition on gaining access to covered materials is limited to using search and seizure to do so; the PPA does not bar the government from obtaining such materials by other lawful means such as grand jury subpoenas and voluntary requests.").

However, the Court is not concerned with congressional reports or other sorts of legislative history. No, what matters are the words that Congress used when it wrote the statute. Thus, interpreting the plain text of the PPA, the Court finds that it is *not* limited to only those cases in which officers acted under authority of a warrant. The "suspect exception" to the PPA, which allows for search and seizure when there is probable cause to arrest the person in possession of the materials, does not apply here because, as the Court has already determined, there was no probable cause to support

the arrest of Mr. Dunn for any crime, much less a crime related to the materials or one involving the death or serious injury to persons or property.

Accordingly, Defendants Motion to Dismiss Mr. Dunn's claim under 42 U.S.C. § 2000aa-6 in Count III is **DENIED.**

## V.  PLAINTIFF'S CLAIMS REGARDING THE CONSTITUTIONALITY OF FORT VALLEY'S TRESPASS BANS AND DISORDERLY CONDUCT ORDINANCE

Because Defendants allege in their Motion to Dismiss that Mr. Dunn lacks standing to contest the constitutionality of the trespass bans issued to him (Count V) and the Fort Valley City Ordinance for disorderly conduct (Count VI), the Court addresses the two counts simultaneously.

Overall, "[s]tanding and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006). Generally speaking, "standing deals with which party can appropriately bring suit, while ripeness relates to the timing of the suit." *Id.*  Since both topics concern the Court's subject-matter jurisdiction, the Court must consider the issues *sua sponte*—even if neither are specifically raised by a defendant. *Reahard v. Lee Cty.*, 30 F.3d 1412, 1418 (11th Cir. 1994).

### Standing

To have standing, a plaintiff must satisfy his burden of alleging facts that "demonstrate injury in fact, causation, and redressability" and thereby affirm that "he is

a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Elend*, 471 F.3d at 1205–06 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The standing inquiry implicates "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.* at 1206 (quoting *Warth*, 422 U.S. at 498). Defendants dispute only the injury-in-fact element, purporting that Mr. Dunn lacks standing for the Court to review claims regarding both the trespass bans (Count V) and Fort Valley's disorderly conduct ordinance (Count VI) because he has not stated an adequate injury. [Doc. 7-1 at pp. 16–19]. However, in an abundance of caution, the Court will nevertheless address *all* constitutional and prudential limitations, *sua sponte,* since they speak to the issue of the Court's jurisdiction. *See Reahard, supra.*

"The prudential requirements for standing [are] that a plaintiff cannot raise the claims of third parties; cannot claim standing based on a generalized grievance; and must raise a claim within the zone of interest covered by a statutory conferral of standing." *Elend,* 471 F.3d at 1206 (citing *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203–10 (11th Cir. 1991)). Here, Defendants raise no issues as to the prudential requirements. Furthermore, the Court, upon *sua sponte* review, finds that Mr. Dunn is not raising a third party's claim; is not seeking standing based on a generalized grievance; and has raised claims within an appropriate "zone of interest" protected by both state and federal constitutions. *See generally* [Doc. 1]. Thus, Mr. Dunn satisfies the

prudential requirements in regard to both Count V and Count VI, and the Court next examines whether he has also satisfied the constitutional requirements.

## Injury in Fact

"A plaintiff is deemed to have suffered an injury in fact—'an invasion of a judicially cognizable interest'—when he demonstrates a harm that is '(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Elend,* 471 F.3d at 1207 (quoting *31 Foster Children v. Bush,* 329 F.3d 1255, 1263 (11th Cir. 2003)). Thus, "a prayer for injunctive and declaratory relief requires an assessment . . . of whether [a] plaintiff has sufficiently shown a "real and immediate" threat of future harm. *Id.* at 1207 (citations omitted).

When, as here, a plaintiff alleges a violation of his First Amendment rights, "[t]he injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action . . . because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Id.* at 1210 (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 (11th Cir. 1991)). In the First Amendment realm, a plaintiff does not have to expose himself to a law enforcement official in order to challenge a law. *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted). Instead the actual injury can exist when a plaintiff is "chilled" from exercising his "right to free expression or forgoes expression in order to avoid enforcement consequences." *Id.* Thus, when this occurs,

"self-censorship" by the plaintiff is "an actual injury." *Id.* However, a plaintiff's self-censorship "will not be held to constitute an injury for standing purposes *unless* that fear [of enforcement consequences] is objectively reasonable[,]" meaning "either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Id.* (first quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) and then citing *N.H. Right to Life Political Action Comm v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) for the proposition that "the credible threat of prosecution standard 'is quite forgiving'").

Furthermore, although "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," instances in which "[a] plaintiff has alleged with particularity that a future injury would likely occur in *substantially the same manner as the previous injury*" demonstrate "a sufficient imminence of future harm based on a past injury." *See Elend,* 471 F.3d at 1208 (emphasis added). A statement of "a concrete, *ongoing* injury" can also suffice to show injury-in-fact. *See Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004).

### Mr. Dunn's Injury in Fact Due to Trespass Bans (Count V)

Mr. Dunn's Complaint states explicitly that he "wishes to further broadcast reports of activities in Fort Valley City Hall and Police Department, including any [newly-posted] Missing Persons announcements." [Doc. 1 at ¶ 72]. As discussed earlier,

the First Amendment clearly protects this sort of activity, and "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citation omitted). And, because of the trespass bans and statements made by Defendants, Mr. Dunn has "self-censored" and refrained from broadcasting his reports "under penalty of arrest and criminal prosecution." *See* [Doc. 1 at ¶¶ 113–121].

Defendants contend that Mr. Dunn's statement of a "wish[ ] to further broadcast reports of activities in Fort Valley City Hall and Police Department, including any newly posted Missing Persons announcements" is too broad and unspecific to demonstrate an injury. [Doc. 7-1 at pp. 17–19]. They argue that Mr. Dunn has not provided a precise enough description of what time in the future he intends to broadcast reports of activities in Fort Valley City Hall and Police Department, and they compare the facts of this case to those of *Elend* (in which the plaintiffs' alleged injury was an interference with their ability to protest at hypothetical future political speeches) and to *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) (in which the plaintiffs alleged injury was an obstruction to their ability to "some day" travel to Sri Lanka).

However, the Court finds that Mr. Dunn's situation is distinct from these cases and, in fact, much more akin to those in *31 Foster Children*, *Church*, and *Fla. Pub. Interest,* all of which demonstrate instances where a past injury may speak to the likelihood of

future harm in substantially the same manner.[21] In light of the plain text of the bans, as well as the written statements of Chief Spurgeon made to Mr. Dunn (which have been crystal clear that he is absolutely banned from entering into City Hall and the Police Station for any purpose and that Chief Spurgeon will "continue to prosecute the [d]isorderly [c]onduct charge in City Court"), the Court finds his fear of arrest to be objectively reasonable. [Doc. 1 at ¶ 81]. Further, there is unquestionably a "substantial likelihood that, absent an injunction, the [Defendants] will continue to act in a similar manner toward [him] in the future" if he attempts to film/broadcast activities in City Hall or at the Police Station or even attempt to enter these public buildings. *Church*, 30 F.3d 1332, 1339 (11th Cir. 1994); [Doc. 1 at ¶¶ 56–73, 106–121]. Because the bans remain in place and restrict his First Amendment rights, Mr. Dunn has, as a matter of law, sufficiently stated a "concrete, ongoing injury." *Fla. Pub. Interest*, 386 F.3d at 1083.

Furthermore, while Defendants correctly point out that Mr. Dunn has yet to state a specific date and time that he plans to return to City Hall or the Police Department, the Court finds this speculation or lack of specificity regarding future filming dates to be entirely reasonable, given that there are ongoing bans that prevent him from filming. Mr. Dunn is not required to provide the Court exhaustive details or have "oracular vision" to achieve standing to contest these bans. *See Elend*, 471 F.3d at 1208. Rather, Mr. Dunn meets his burden by confirming his desire to film in City Hall and the

---

[21] *See also*, *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984).

Police Station in order to compile broadcasts for his independent journalistic endeavors and his Complaint clearly and succinctly discloses both "where [*and*] how he intends to exercise his right to free speech in the future." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220–21 (11th Cir. 2010). Therefore, he has sufficiently "illuminate[d] the specifics of his claimed injury" for purposes of this Motion. *Id*. at 1221.

<u>**Mr. Dunn's Injury in Fact Due to Ordinance (Count VI)**</u>

Fort Valley City Ordinance 62-11 states, "[i]t shall be unlawful for any person to fight, be guilty of any riotous or disorderly conduct, or disturb the peace and quiet of any person in any other manner within the corporate limits of the city." [Doc. 1 at ¶ 52]. Mr. Dunn contends that the ordinance, both facially and as applied, violates his right to freedom of speech under both the federal and state constitutions because the ordinance is overly broad. [*Id.* at ¶¶ 123–125]. He argues that "Fort Valley's ordinance . . . capture[s] virtually any free speech activity, including any protest, demonstration, offensive signs, and even the street corner speaker." [*Id.* at ¶ 124]. Specifically, Mr. Dunn claims that, "[u]nlike Georgia's more narrowly crafted disorderly conduct statute," Fort Valley's ordinance unconstitutionally broadens the offense by including the phrase "disturb[ing] the peace and quiet of any person in any other manner." [*Id.*].

Defendants argue that Mr. Dunn lacks the standing to bring this claim because he has not shown the Court that he suffered the requisite injury in fact due to the ordinance. [Doc. 7-1 at pp. 16–19]. "Chief Spurgeon . . . instructed Lt. Marshall to charge

Mr. Dunn with Disorderly Conduct, a violation of Fort Valley City Ordinance 62-11"
following his arrest. [Doc. 1 at ¶ 50]. While the District Attorney eventually dismissed
the charge, when Mr. Dunn requested that the bans issued incident to the arrest be
lifted, "Chief Spurgeon threatened to continue to prosecute the Disorderly Conduct
charge in City Court." [*Id.* at ¶ 81].

The Court finds that Mr. Dunn's Complaint has demonstrated sufficient injury
in fact due to the city ordinance to survive Defendants' Motion to Dismiss. He has
already been arrested once for allegedly violating this very ordinance and, according to
his Complaint has been specifically and directly threatened with another prosecution of
the ordinance in question. His arrest and threat of future arrest is more than enough to
satisfy "an actual injury." *See, e.g.*, *Wilson*, 132 F.3d at 1428.

## Causal Connection and Redressability

As to the remaining elements of standing, "there must be a causal connection
between the injury and the conduct complained of" and "it must be 'likely,' as opposed
to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"
*Elend*, 471 F.3d at 1206 (quoting *Lujan*, 504 U.S. at 560–61). Here, Defendants do not raise
issues regarding the requirements of causation and redressability. *See* [Doc. 7-1]. Upon
*sua sponte* review, the Court finds those requirements are satisfied as to both the bans
and the ordinance. Mr. Dunn's alleged injury demonstrates a "causal connection" by
being "fairly traceable" to the trespass bans and city ordinance. *See Elend*, 471 F.3d at

1206. Mr. Dunn's account of events, if shown to be true, demonstrate that Defendants have relied upon the bans and ordinance in their actions and decisions toward Mr. Dunn and the continued chilling of his constitutional rights. *Id*. Likewise, the Court finds that Mr. Dunn shows redressability in that his alleged injury is a chilling of his constitutional rights due to these bans and the ordinance he reasonably fears will be enforced if he attempts to broadcast activities at City Hall or the Police Station. It is axiomatic, then, that his injury would be "redressed by a favorable decision" granting his request for injunctive and declaratory relief to prevent enforcement of these bans and the ordinance against Mr. Dunn for protected First Amendment activity. *Id.*

### Ripeness

Defendants do not argue the point of ripeness, and the analysis applied is very similar to that applied to the injury-in-fact analysis outlined above. *See* [Doc. 7-1]. Ripeness, easily enough, "involves the evaluation of two factors: the hardship that a plaintiff might suffer without court redress and the fitness of the case for judicial decision." *Dermer*, 599 F.3d at 1221 (quoting *Elend*, 471 F.3d at 1211). A plaintiff can show the requisite hardship by demonstrating that he would have to risk criminal sanctions by violating an allegedly unconstitutional statute or if he could show a credible threat of prosecution, such as warnings or threats of arrest. *See Elend*, 471 F.3d at 1211 (citation omitted). The language of the written trespass bans imposed upon him, the warnings from Lt. Marshall, and the threat from Chief Spurgeon that he would

resurrect the disorderly conduct charge in City Court all indicate that Mr. Dunn would face criminal penalties if he violates the bans. Therefore, Mr. Dunn has shown the requisite hardship by stating that he wishes to continue broadcasting activities from City Hall but cannot due to the bans and threats to enforce the ordinance against him. [Doc. 1 at ¶ 72, 80–81].

Whether a case is "fit for judicial decision" will allege sufficient facts to "produce a well-reasoned decision on the constitutionality of [the issue]." *Hallandale*, 922 F.2d at 763. Thus, Mr. Dunn must plead facts that, if demonstrated to be true, "present[ ] a concrete adverseness of interests: [showing that] the plaintiff seriously and plausibly wanted to engage in specific conduct or speech which was arguably prevented or made more difficult by the challenged governmental action." *Id.* (citation omitted). Here, Mr. Dunn has demonstrated that there is "concrete adverseness of interests" in weighing his expressed desire to continue filming in City Hall and the Police Station as part of his independent news coverage against the wishes of the City of Fort Valley and the named law enforcement officials in issuing bans they categorize as "proactive measure[s]" that were "both necessary and prudent." [Doc. 1 at ¶ 68].

Accordingly, the Court finds Mr. Dunn's Complaint contains sufficient allegations to satisfy requirements for both standing and ripeness, and, therefore, **DENIES** Defendants' Motion to Dismiss as it pertains to Counts V and VI.

**VI.**   **PLAINTIFF'S CLAIM FOR A STATE OPEN RECORDS ACT VIOLATION**

It is well established that federal courts may consider state-law claims through the exercise of supplemental jurisdiction when state law claims arise from the same events as federal claims over which the court has original jurisdiction. 28 U.S.C. § 1367(a). Mr. Dunn relies upon this principle when bringing Count VII of his Complaint, regarding his attempts to access to public records relating to the above events. Mr. Dunn alleges that, pursuant to Georgia state law provisions for open public access to agency records, he has made several requests to the City of Fort Valley records, and that the City has failed to adequately respond. [Doc. 1 at ¶¶ 126–129].

In the state of Georgia, "[a]ll public records shall be open for personal inspection and copying, except those which by order of a court of this state or by law are specifically exempted from disclosure." O.C.G.A. § 50-18-71(a). Accordingly, requested records must be timely produced as provided by the detailed state law when they are requested for inspection. *See generally* O.C.G.A. § 50-18-71. Furthermore, if a city "is required to or has decided to withhold all or part of a requested record, [it] shall notify the requester of the specific legal authority exempting the requested record or records from disclosure" and timely provide the requester with details regarding the decision to withhold the record(s). *Id.* at § 50-18-71(d).

The Defendants' argument for dismissal of this claim is based solely on the grounds that the Court should decline to exercise supplemental jurisdiction over this

state-law claim. [Doc. 7-1 at pp. 19–20]. Since, as discussed above, the Court **DENIES**

Defendants' Motion to Dismiss as to Mr. Dunn's federal claims, the Court likewise

**DENIES** Defendants' Motion as it pertains to Count VII.

## VII.    <u>CONCLUSION</u>

In summary, as discussed above, the Court **DENIES** Defendants' Motion to

Dismiss [Doc. 7] in its entirety, and all seven claims shall proceed to discovery.[22] While

Mr. Dunn may not ultimately win on any of the counts in his Complaint, he will have

the complete, total, and unfettered opportunity to make his case.

**SO ORDERED**, this 19th day of May, 2020.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[22]  The Court **LIFTS** the stay of discovery previously ordered, [Doc. 9], and it will issue a separate Order requiring the parties to submit a Rule 16/26 scheduling order within 30 days.